**Dorothy A. GRAHAM, as Executrix of Estate of James Graham, Deceased, Plaintiff/Appellant,**

v.

**TELEDYNE–CONTINENTAL MOTORS, A DIVISION OF TELEDYNE INDUSTRIES, INC., Teledyne Industries, Inc., and National Transportation Safety Board, Defendants/Appellees.**

Nos. 86–1530, 86–1668.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 13, 1986.

Decided Dec. 10, 1986.

As Amended on Denial of Rehearing and Rehearing En Banc Feb. 11, 1987.

Morris Davidovitz, Fisher & Hurst, San Francisco, Cal., for plaintiff/appellant.

Michael Kelly, Kirtland & Packard, Los Angeles, Cal., Chris Stoll, Asst. U.S. Atty., U.S. Atty.'s Office, San Francisco, Cal., Peter R. Maier, U.S. Dept. of Justice, Washington, D.C., for defendants/appellees.

Before HUG, BEEZER and KOZINSKI, Circuit Judges.

KOZINSKI, Circuit Judge.

When an airplane crashes, the National Transportation Safety Board (NTSB) takes possession of various component parts for purposes of inspection and testing. In this case we consider the claim of the pilot's estate that its representative be allowed to participate in, or at least observe, the NTSB's procedures in order to protect its interests in civil litigation arising from the accident.

## Facts

James Graham was the pilot of a twin engine Beechcraft Baron aircraft that crashed into the Sun Valley Mall in Concord, California on December 23, 1985. The accident resulted in five fatalities, numerous injuries and extensive property damage. Appellant Dorothy Graham, the executrix of James Graham's estate, has been named a defendant in several lawsuits arising from this event.

As charged by the Independent Safety Board Act of 1974, 49 U.S.C. §§ 1901 *et seq.* (1982), the NTSB began an immediate investigation into the cause of the accident. To this end, the NTSB directed that the aircraft's two engines be shipped to their manufacturer, Teledyne Industries, Inc. (Teledyne). There the agency planned to conduct a complete teardown analysis. In accordance with NTSB practice, the proposed inspection and disassembly was to be conducted by Teledyne engineers working in conjunction with, and under the supervision of, NTSB officials.

The practice of disassembling airplane engines and other component parts on the premises of their manufacturer, with the assistance and participation of the manufacturer's personnel, grows out of the NTSB's belief that the manufacturer and its staff are best equipped to perform such functions. Each manufacturer uses somewhat different designs and specifications, requiring somewhat different tools and techniques for disassembly. The NTSB has determined that use of the manufacturer's facilities and personnel will maximize its ability to determine the cause of the accident while minimizing cost.[1]

On learning that the NTSB was shipping the engines to Teledyne for inspection and testing, appellant requested permission to have her technical representative participate in, or at least observe, the teardown inspection. Appellant asserted an interest because of the related civil litigation; she expressed fears about possible destructive testing and spoliation of evidence. The NTSB and Teledyne refused appellant's demands. Appellant then brought this action seeking interlocutory and permanent injunctive relief. She alleged that the NTSB examination would cause irreparable harm due to the destruction of evidence, deprive her of due process by impairing her legal rights and remedies, and take her property

---

1. Cost is minimized because this practice saves the NTSB from maintaining staff and facilities capable of disassembling every type of airplane component used in civil aviation in the United States.

(consisting of these rights) without just compensation.

The district court denied a temporary restraining order, holding that the NTSB did not abuse its discretion under applicable statutes and regulations in deciding who shall participate in the accident investigation. In addition, the district court determined that appellant had failed to establish that any constitutional right would be violated by the pending engine examination.

Graham immediately appealed, challenging the denial of the temporary restraining order. A motions panel of this court enjoined appellees from conducting destructive testing pending resolution of the appeal.

**Standard of Review**

This is an appeal from the denial of a temporary restraining order. Generally, such an appeal is premature. *Kimball v. Commandant Twelfth Naval District,* 423 F.2d 88, 89 (9th Cir.1970). In this case, however, the denial of the TRO effectively decided the merits of the case: should the NTSB and Teledyne proceed with the disassembly and inspection of the engines, appellant's claims will be rendered moot. Under these circumstances, the court will not require litigants to go through the futile act of reapplying for permanent relief and the denial of a TRO may be treated as a de facto denial of a permanent injunction. *See id.; Northern Stevedoring & Handling Corp. v. International Longshoremen's & Warehousemen's Union Local No. 60,* 685 F.2d 344, 347 (9th Cir.1982).

Normally, an appeal from an order granting or denying interlocutory injunctive relief would be reviewed for abuse of discretion, and the inquiry would consider such factors as the balance of hardships and plaintiff's likelihood of success on the merits. *See, e.g., Benda v. Grand Lodge of the Int'l Ass'n of Machinists,* 584 F.2d 308, 315 (9th Cir.1978), *cert. dismissed,* 441 U.S. 937, 99 S.Ct. 2065, 60 L.Ed.2d 667 (1979). However, in this case the only issue we need consider is whether the district court correctly applied the law. There are no facts in dispute, and, as noted, this appeal will effectively resolve the merits: if the district court correctly applied the law, the NTSB will proceed with its testing and the case will be rendered moot; if the district court erred, plaintiff will be entitled not merely to a TRO, but also to permanent injunctive relief. Despite the posture of the case, therefore, we treat this as an appeal from a final judgment denying permanent injunctive relief. *See Kansas ex rel. Stephan v. Adams,* 608 F.2d 861, 867 n. 5 (10th Cir.1979), *cert. denied,* 445 U.S. 963, 100 S.Ct. 1651, 64 L.Ed.2d 238 (1980); *Jackson County v. Jones,* 571 F.2d 1004, 1007 (8th Cir.1978). The district court's interpretation of the applicable law is subject to de novo review. *International Molders & Allied Workers' Local Union No. 164 v. Nelson,* 799 F.2d 547, 551 (9th Cir.1986).[2]

**Discussion**

Appellant bases her claim for relief on two sources of authority. First, she argues that the regulations promulgated by the NTSB pursuant to the Independent Safety Board Act give her a right to participate in the inspection and disassembly procedures, or at least render it an abuse of discretion for the NTSB to refuse her request to participate. Second, she argues that the NTSB's refusal denies her the constitutionally guaranteed right to due process. We consider Graham's regulatory claim first, because doing so might obviate the need to reach the constitutional issue.

---

**2.** The NTSB argues that its decision to exclude appellant from the examination is one "committed to agency discretion by law" and is therefore immune from judicial review under 5 U.S.C. § 701(a). The agency has not established by the necessary "clear and convincing evidence" that the legislature intended to restrict access to judicial review in this area. *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136 (1971). Specifically, the NTSB must show that the statute in question provides "no meaningful standard" against which to judge the agency's action. *Heckler v. Chaney,* 470 U.S. 821, 830, 105 S.Ct. 1649, 1655, 84 L.Ed.2d 714 (1985). The code sections authorizing the NTSB's investigation contain a variety of limitations on the agency's power. *See, e.g.,* 49 U.S.C. § 1441(a), (c) (1982). Nothing in the statutory language suggests that Congress intended to foreclose judicial consideration of claims that the agency exceeded those limits.

*Hagans v. Lavine*, 415 U.S. 528, 546–47 & n. 12, 94 S.Ct. 1372, 1384 & n. 12, 39 L.Ed.2d 577 (1974).

### 1. *The Regulations*

Appellant bases her claim on 49 C.F.R. §§ 831.9(a) & 831.10(a), which govern who will participate in the investigation and who may have access to the aircraft wreckage. However, neither of these sections gives appellant the rights she seeks. Section 831.9(a)[3] provides that NTSB's "investigator-in-charge *may* ... designate parties to participate in the field investigation." The section is written in the permissive. It gives no one a right to participate; it merely authorizes the investigator to designate parties to the investigation. Section 831.-10(a)[4] is even less helpful to appellant. That section restricts access to the wreckage to "the Board's accident investigation personnel and persons authorized ... to participate in any particular investigation, examination or testing." Since appellant's representative is not so authorized, he simply does not qualify under this regulation.

Appellant argues, however, that the NTSB's refusal to designate her representative as a participant in the investigation constitutes an abuse of discretion. In appellant's view, the NTSB was not entitled to exclude an entity with "legitimate interests" in the outcome of the investigation, while at the same time permitting Teledyne, a party with similar interests, to participate.[5]

3. The regulation states, in part:
     The investigator-in-charge may ... designate parties to participate in the field investigation. Parties to the field investigation shall be limited to those persons, government agencies, companies, and associations whose employees, functions, activities, or products were involved in the accident or incident and who can provide suitable qualified technical personnel to actively assist in the field investigation.
   49 C.F.R. § 831.9(a) (1985).

4. The regulation provides:
     Only the Board's accident investigation personnel and persons authorized by the investigator-in-charge, the Director, Bureau of Accident Investigation, or the Director, Bureau of Field Operations to participate in any particular investigation, examination or testing shall

Appellant's attempt to impose upon the NTSB investigation rules of procedural fairness reflects a misconception of the Board's mission. The NTSB's authorizing statute provides that the Board shall "investigate or cause to be investigated (in such detail as it shall prescribe), and determine the facts, conditions, and circumstances and the cause or probable cause or causes of any ... aircraft accident." 49 U.S.C. § 1903(a)(1) (1982). These investigations are not primarily for the purpose of determining civil liability; indeed, the Board has no authority to adjudicate the rights of private parties. The NTSB's function is "to promote transportation safety by conducting independent accident investigations and by formulating safety improvement recommendations." 49 U.S.C. § 1901(1) (1982).

■ We conclude that the NTSB did not abuse its discretion by deputizing Teledyne to participate in the investigation but refusing to accord Graham's representative the same status. Wherever the parties may stand with respect to each other under applicable tort law, they stand on much different footing vis-a-vis the NTSB's investigation. The use of Teledyne's facilities and expertise in disassembling its own engines could be indispensible in enabling the NTSB to carry out its mission. *See* 49 C.F.R. § 831.9(a) (1985). By contrast, there is nothing unique appellant's expert could add to the investigation, or so the NTSB could rationally decide.[6] The only

     be permitted access to aircraft wreckage, records, mail, or cargo which is in the Board's custody.
   49 C.F.R. § 831.10(a) (1985).

5. Appellant argues quite plausibly that her interests are antithetical to those of Teledyne. The plane crash was most likely caused either by mechanical failure or pilot error. Establishing one would tend to exclude the other. Graham believes that, by having its technical representatives present when the engines are torn down, Teledyne is given a substantial advantage in any subsequent adjudication of liability.

6. In addition to being the pilot's representative, Graham also claims status as the "alleged owner" of the aircraft. The district court found, however, that she had not established an ownership interest.

one connected with appellant who might have had unique insight into what happened was James Graham, the pilot, who is dead. The NTSB did not abuse its discretion by determining that it did not require appellant's representative as a participant or observer in the teardown of the engines.[7]

### 2. *The Constitution*

■ Appellant next argues that denying her access to the teardown inspection violates her right to due process. She contends that her right to contribution or indemnity from others involved in the accident is a property right that will be impaired if appellees are allowed to conduct destructive testing. Although appellant's interest in the investigation may be substantial, we conclude that her exclusion does not rise to the level of a due process violation.

Assuming appellant has a property interest in her contribution/indemnity cause of action,[8] she will suffer no deprivation of that right. At most, appellant may be deprived of certain evidence that could assist her in litigation. Courts have consistently rejected arguments that deprivation of evidence constitutes a denial of due process. *See, e.g., Rosen v. NLRB*, 735 F.2d 564, 577

(D.C.Cir.1984) (no due process right to offer evidence barred by attorney-client privilege); *Samuelson v. Susen*, 576 F.2d 546, 553 (3d Cir.1978) (medical review committee privilege denying plaintiff information central to defamation action does not violate due process); *Coughlin v. Westinghouse Broadcasting & Cable, Inc.*, 603 F.Supp. 377, 382–83 (E.D.Pa.) (shield law does not violate due process), *aff'd*, 780 F.2d 340 (3d Cir.1985), *cert. denied*, —— U.S. ——, 106 S.Ct. 2927, 91 L.Ed.2d 554 (1986).

In addition, it is highly speculative whether appellant will in fact be deprived of any evidence. While having her representative present at the teardown is one way to ascertain what went wrong, other avenues are open to appellant to obtain substantially similar proof. Appellant will have access to the NTSB factual reports from the investigation. 49 C.F.R. § 845.50 (1985). Moreover, although the expert testimony of Board employees is inadmissible, Graham may secure the testimony of NTSB investigators concerning the factual information they gathered during the course of the accident investigation. *Id.* § 835.3(a), (b). Finally, she will presumably have access to the physical evidence itself after the engines have been released by the NTSB.[9]

---

7. The district court determined, as an alternate ground for denying access to appellant, that Graham's representative also represented an insurance company. Under the regulations, this would render him entirely ineligible to participate in the investigation. *See* 49 C.F.R. § 831.-9(c) (1985). Appellant contends this finding was clearly erroneous. Given our ruling, we need not reach this issue.

8. There is some doubt on this score. *Compare Duke Power Co. v. Carolina Envtl. Study Group, Inc.*, 438 U.S. 59, 88 n. 32, 98 S.Ct. 2620, 2638 n. 32, 57 L.Ed.2d 595 (1978) (no property interest in any rule of common law) and *Ducharme v. Merrill-National Laboratories*, 574 F.2d 1307, 1309 (5th Cir.), *cert. denied*, 439 U.S. 1002, 99 S.Ct. 612, 58 L.Ed.2d 677 (1978) (no vested right in tort claim abrogated by Swine Flu Act), *with In re Aircrash in Bali, Indonesia*, 684 F.2d 1301, 1312 (9th Cir.1982) (wrongful death claim is property within meaning of fifth amendment's takings clause); *Singer Co. v. Superior Court*, 179 Cal.App.3d 875, ——, 225 Cal.Rptr. 159, 168 (1986) (tortfeasor has property right in contribution/indemnity action).

9. Appellant has expressed concern that Teledyne may alter or destroy vital evidence. This case,

however, is not much different from those where an adverse party retains possession of key elements of proof, e.g., purloined trade secrets, documents proving fraud, or machinery involved in personal injury accidents. The presumptions and sanctions available to punish those who alter or destroy evidence must be considered sufficient to deter any misconduct and Teledyne is no doubt aware that its handling of the materials may come under intense scrutiny. *See, e.g.,* Fed.R.Civ.P. 37; *Alexander v. National Farmers' Org.*, 687 F.2d 1173, 1205–06 (8th Cir.1982), *cert. denied*, 461 U.S. 937, 103 S.Ct. 2108, 77 L.Ed.2d 313 (1983) (inference may be drawn against party destroying documents); *Bowmar Instrument Corp. v. Texas Instruments, Inc.*, 25 Fed.R.Serv.2d 423, 427 (N.D.Ind.1977) (sanctions appropriate where party destroyed evidence it should have known would be relevant in future litigation). In any case, as we understand the NTSB's procedures, the engines will be handled by Teledyne employees only under the supervision of NTSB investigators.

Graham's remaining claim for a taking of property is premature. If and when she suffers a deprivation, she may bring an inverse condemnation claim under the Tucker Act, 28 U.S.C. §§ 1346(a)(2), 1491 (1982). Such a suit, brought after the NTSB's investigation is completed, would avoid much of the speculation inherent in appellant's current action. It would also allow the NTSB to proceed with its investigation, unencumbered by concerns extraneous to—and inconsistent with—the important mission entrusted it by Congress.[10]

### Conclusion

The denial of the temporary restraining order by the trial court is affirmed. We remand with instructions that judgment be entered for defendants.

---

**10.** Appellant is not the only one who can claim a legitimate interest in the NTSB's investigation; presumably the estates of others killed in the Sun Valley Mall crash, as well as those who were injured or suffered property damage, could assert that their rights will be impaired if their representatives are not allowed to observe the teardown. If appellant's claim were sustained on constitutional grounds, it would be difficult to exclude these others. The problem would be infinitely multiplied in a crash involving an airliner where literally hundreds of interested parties may be in the position of having some interest potentially affected by the NTSB's investigation. The NTSB would be rendered entirely ineffective in carrying out its mission if it were required to allow all of these parties access to every critical step of the investigation. The government must be allowed to carry out its responsibilities; if private property is taken in the process, the appropriate remedy is a suit for compensation. *Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1019–20, 104 S.Ct. 2862, 2882, 81 L.Ed.2d 815 (1984); *Dames & Moore v. Regan,* 453 U.S. 654, 688–90, 101 S.Ct. 2972, 2991–92, 69 L.Ed.2d 918 (1981).