# United States Court of Appeals
## For the First Circuit

No. 23-1813, 23-1828

MONISHA GUPTA, SWAPNIL VIJAY KUMAR GADKARI, NIKUNJ PATEL, ANUJA
PATEL,

Plaintiffs, Appellants,

v.

UR MENDOZA JADDOU, Director, United States Citizenship and
Immigration Services, ANTONY BLINKEN, Secretary, United States
Department of State,

Defendants, Appellees.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Indira Talwani, U.S. District Judge]

Before

Barron, Chief Judge,
Lipez and Kayatta, Circuit Judges.

Brad Banias, with whom Banias Law, LLC was on brief, for
appellants.
Alessandra Faso, Trial Attorney, Office of Immigration
Litigation, with whom Brian M. Boynton, Principal Deputy Assistant
Attorney General, Civil Division, William C. Peachey, Director,
Office of Immigration Litigation, Glenn M. Girdharry, Assistant
Director, Office of Immigration Litigation, and Aaron S.
Goldsmith, Senior Litigation Counsel, Office of Immigration
Litigation, were on brief, for appellees.

October 16, 2024

**BARRON**, **Chief Judge**. This appeal concerns a lawsuit by four noncitizens from India, most of whom have been lawfully present and residing in this country for at least the last ten years. Although the plaintiffs applied for permanent residency in the United States more than four years ago, their applications have not yet been adjudicated. In response, they filed these suits in the United States District Court for the District of Massachusetts under the Administrative Procedure Act ("APA"), 5 U.S.C. § 500 et seq. They allege unlawful withholding and unreasonable delay of agency action. They name as defendants the Director of the United States Citizenship and Immigration Services ("USCIS"), Ur Mendoza Jaddou, and the Secretary of the United States Department of State ("DOS"), Antony Blinken. The District Court dismissed these claims pursuant to Federal Rule of Civil Procedure 12(b)(6), for failure to state a claim on which relief may be granted, and Federal Rule of Civil Procedure 12(b)(1), for want of subject-matter jurisdiction. We affirm based on the former ground.

## I.

To understand the issues at play on appeal, it helps to understand the relevant statutory and regulatory landscape. After describing this landscape in a rather detailed way and the many aspects of it that bear on the processing of an application for

permanent legal residency, we retrace the path from the filings of these lawsuits to the appeals at hand.

## A.

The two main statutory provisions at issue are 8 U.S.C. § 1255(a) and (b). Under the first provision, § 1255(a), a noncitizen who, like each of the plaintiffs here, is lawfully present in the United States and seeks legal permanent resident status must (1) apply for "adjustment" of his status; (2) be "eligible to receive an immigrant visa and . . . admissible to the United States for permanent residence"; and (3) have an immigrant visa "immediately available to him <u>at the time his application is filed</u>." 8 U.S.C. § 1255(a) (emphasis added). If each of these three statutory requirements is met, then § 1255(a) provides that the Secretary of the U.S. Department of Homeland Security ("DHS") "may" adjust the noncitizen's status to that of a legal permanent resident "in his discretion and under such regulations as he may prescribe." <u>Id.</u>[1]

Under the second provision, § 1255(b), the approval by the DHS Secretary of an application for adjustment triggers two additional processes. First, the DHS Secretary is directed to

---

[1] As enacted, the Immigration and Naturalization Act's text vests the Attorney General of the United States with the authority to adjust nonimmigrants' statuses, but Congress has since transferred that authority to the Secretary of Homeland Security. <u>See</u> 6 U.S.C. §§ 271(b)(5), 557; 1 USCIS, <u>Policy Manual</u>, pt. E, ch. 8, § B(3) n.39 (2024).

"record the [noncitizen]'s lawful admission for permanent residence as of the date" of approval. Second, the DOS Secretary "shall reduce by one the number of the preference visas authorized to be issued" to "the class to which the [noncitizen] is chargeable for the fiscal year then current." 8 U.S.C. § 1255(b).

As § 1255(b) indicates, the total number of immigrant visas that may be issued in each fiscal year is capped by statute. In addition, the total number of "available" immigrant visas in each fiscal year is allocated by statute among various categories of eligible noncitizens. See 8 U.S.C. § 1151.

The type of immigrant visa that each of the plaintiffs seeks is an "employment-based visa" ("EB visa"). Among EB visas, there are five statutorily prescribed "preference categories." 8 U.S.C. § 1153(b). The category to which each of the plaintiffs here claims to belong is the second preference category, which is for "[p]rofessionals with advanced degrees or persons of exceptional ability" ("EB2"). 22 C.F.R. § 42.32(b).

The path to obtaining an EB2 visa and becoming a legal permanent resident is complicated. Generally, a noncitizen's U.S.-based employer will first file a labor certification with, and have that certification approved by, the U.S. Department of Labor. See 20 C.F.R. § 656.10; see also 6 USCIS, Policy Manual, pt. E, ch. 6, § A(1) (2024). Next, the employer or noncitizen files a Form I-140 petition to USCIS. See 8 C.F.R. § 204.5(a),

- 5 -

(c).  For the final step -- the one at the heart of this appeal -- the noncitizen, upon approval of her Form I-140 petition, files a Form I-485 application to USCIS to adjust her status.  See generally 8 C.F.R. § 245.  If the application is approved, USCIS grants the applicant legal permanent residency and DOS allocates an immigrant visa number from the applicable preference category for the current fiscal year.  8 U.S.C. § 1255(b).

When a noncitizen files her Form I-485 application, she is "placed in a queue with others in her category" because "demand [for visas] regularly exceeds the supply" due to the applicable statutory caps on issuance.  Scialabba v. Cuellar de Osorio, 573 U.S. 41, 48 (2014) (plurality opinion) (describing the same issue in the family-based immigrant visa context); see also 3 Gordon et al., Immigration Law and Procedure § 39.01(2) (2024).  Applications for adjustment of status that are in the queue are processed on a "first-come, first-served [basis] within each preference category," and an applicant's place in the queue is marked by her "priority date."  Scialabba, 573 U.S. at 48 (plurality opinion); see 22 C.F.R. § 42.51(b).  An applicant's "priority date" is either the date on which the labor certification was filed or, if no certification was filed, the date on which the Form I-140 petition was filed.  See 8 C.F.R. § 245.1(g)(2); 7 USCIS, Policy Manual, pt. A, ch. 6, § C(3) (2024).

The Immigration and Naturalization Act ("INA") authorizes DOS to make reasonable estimates of anticipated visa issuance based on information provided by U.S. consular officers and USCIS officers. See 8 U.S.C. § 1153(g); 22 C.F.R. § 42.51. Pursuant to that authority, DOS maintains a "Visa Bulletin." The Bulletin, which DOS publishes monthly, sets forth charts for different types of visas. See Bureau of Consular Affs., U.S. Dep't of State, Pub. No. 9514, Visa Bulletin: Immigrant Numbers for September 2024 (2024), https://travel.state.gov/content/dam/visas/Bulletins/visabulletin_September2024.pdf.

Each chart lists the relevant visa preference categories in rows on the far-left side of the chart and the relevant foreign state in columns at the very top of the chart. See id. The spaces where the preference-category rows intersect with the foreign-state columns are populated with specific dates.

When the Bulletin lists a date for a particular preference category and foreign state, the date is "current" and -- based on DOS's estimate -- a visa is "immediately available" to applicants whose priority dates are either the same or earlier than the listed "current" date. A visa is considered "immediately available" when the agency or consular officer could issue an immigrant visa to an applicant without exceeding the statutory caps imposed by Congress in 8 U.S.C. §§ 1151, 1152, and 1153. See Visa Availability and Priority Dates, USCIS (Apr. 29, 2020),

https://www.uscis.gov/green-card/green-card-processes-and-procedures/visa-availability-and-priority-dates.

Because dates are deemed to be "current" based on DOS's estimates regarding visa supply and demand, the dates can vary between Bulletins. 3 Gordon et al., Immigration Law and Procedure § 39.01(2) (2024). For example, a "current" date may move forward (i.e., indicate that visas are "immediately available" for later-in-time applicants who joined the queue more recently) if visa supply increases or visa demand decreases for a given month. Id. Alternatively, a "current" date may move backward -- or "retrogress[]" (i.e., indicate that visas are "immediately available" only for earlier applicants who have been in line longer) -- if visa supply or demand unexpectedly decreases or increases, respectively, in a given month. Id.; 7 USCIS, Policy Manual, pt. A, ch. 6, § C(5) (2024).

**B.**

Two of the plaintiffs involved in this appeal, Nikunj and Anuja Patel, applied for legal permanent residency in the United States on October 27, 2020. The other two plaintiffs, Monisha Gupta and Swapnil Vijay Kumar Gadkari, applied for legal permanent residency on October 30, 2020.[2] While their Form I-485

---

[2] Legal permanent residency is "the status of having been lawfully accorded the privilege of residing permanently in the United States as an immigrant in accordance with the immigration laws . . . ." 8 U.S.C. § 1101(a)(20).

applications were pending, Gupta and Gadkari filed suit together in the U.S. District Court for the District of Massachusetts, naming Ur Jaddou, Director of USCIS, as the sole defendant. The Patels separately did the same while their Form I-485 applications were pending.

The respective complaints alleged that each of the plaintiffs had "taken every step USCIS has requested, suggested, and required" with respect to their applications, including having met the eligibility requirements for applying for adjustment that § 1255(a) sets forth. Yet, the complaints alleged, the plaintiffs continue to wait for a final adjudication by USCIS on their allegedly "adjudication[-]ready" applications. For relief, the plaintiffs sought to compel USCIS to adjudicate their pending Form I-485 applications. The District Court subsequently consolidated the suits for pre-trial proceedings.

Two months after initiating their suits, the plaintiffs amended their complaints and added Antony Blinken, the DOS Secretary, as a defendant. The amended complaints additionally allege that, on September 6, 2022, DOS issued a memorandum stating that there were no more available EB2 visas until the end of the fiscal year because DOS had issued visas up to the maximum amount permitted by statute. The amended complaints allege as well that, due to the decrease in visa supply and lack of corresponding decrease in visa demand, the "current" dates on the Visa Bulletin

retrogressed from December 1, 2014, to April 1, 2012.  Thus, the amended complaints allege, no visas were "immediately available" to the plaintiffs once the new fiscal year started.[3]

In the amended complaints, the plaintiffs assert claims of unlawful withholding and unreasonable delay of agency action under the APA against both the Director of the USCIS and the Secretary of the DOS.  The plaintiffs first challenge USCIS's practice of not adjudicating validly filed Form I-485 applications until an immigrant visa becomes "immediately available" to the applicants.  They allege that this practice is barred by 8 U.S.C. § 1255 and that USCIS's failure to adjudicate the plaintiffs' applications thus constitutes unlawfully withheld and unreasonably delayed agency action.  See 5 U.S.C. § 706(1).  In addition, the plaintiffs challenge DOS's policy regarding visa issuance following USCIS approval.  They allege that, even if USCIS approved an application without a corresponding "immediately available" visa, DOS would refuse to issue a visa unless one was in fact "immediately available" to the applicant.  The plaintiffs argue that, because of § 1255(b), this DOS policy regarding visa issuance constitutes agency action that is unlawfully withheld.  See id.

Following the defendants' motions for dismissal and the parties' cross-motions for summary judgment, the District Court

---

[3] Gupta and Gadkari's priority date is November 7, 2012.  The Patels' priority date is June 26, 2014.

granted the defendants' motion to dismiss and denied the parties' motions for summary judgment as moot in an order dated September 27, 2023. The District Court ruled that the plaintiffs' contention that 8 U.S.C. § 1255 prohibits USCIS and DOS from requiring that an immigrant visa be "immediately available" at the time of adjudication was without merit. The District Court therefore held that the agencies' policy of holding Form I-485 applications for adjudication until an immigrant visa is "immediately available" to the applicant is a "decision or action . . . the authority for which is specified . . . to be in the discretion of . . . the Secretary of Homeland Security" under 8 U.S.C. § 1252(a)(2)(B)(ii), and, accordingly, not subject to judicial review. For the same reasons, the District Court also ruled that the challenged agency action was committed to agency discretion and thus that the plaintiffs also failed to state claims for unreasonable delay and unlawful withholding under the APA. The plaintiffs timely appealed.

## II.

As a threshold matter, the defendants contend that we must affirm the dismissal of the plaintiffs' claims on jurisdictional grounds under Article III of the U.S. Constitution. The defendants argue that is so because the plaintiffs' alleged injuries are neither traceable to the defendants nor redressable by a federal court, as those injuries must be for the plaintiffs

to have Article III standing to bring their claims.  See Lujan v. Defs. of Wildlife, 504 U.S. 555, 560-61 (1992).

In asserting that the plaintiffs' injuries are traceable only to statutes enacted by Congress and so not to the challenged USCIS and DOS policies themselves, the defendants emphasize that Congress enacted a statutory scheme that imposes various caps on EB2 issuance.  The defendants then go on to argue that these caps limit the agencies' ability to meet the plaintiffs' demand for visas for reasons independent of either the USCIS or the DOS policy that the plaintiffs challenge.

The defendants separately contend, for similar reasons, that the plaintiffs' injuries are not redressable by a federal court.  The defendants assert that the relief that the plaintiffs seek -- faster adjudication of their applications by USCIS -- requires that a visa be "available" to be issued to the plaintiffs at the time the application is adjudicated by USCIS. They further assert that, statutorily, the defendants cannot issue a visa to the applicants outside of their priority date order. See 8 U.S.C. § 1153(e).  The defendants contend that it follows that granting the requested relief would require the defendants to take one of two paths: violate their statutory obligations or deny the plaintiffs' applications. Yet, the defendants argue, the first path is unlawful, and the second path would conflict with the plaintiffs' interests.  And so, because the defendants contend

- 12 -

that federal courts are without the authority to order the agencies to issue a visa "before it is [the plaintiffs'] turn," they assert that the plaintiffs' claims are not redressable by a federal court. We are not persuaded.

The plaintiffs allege that (1) they "went from having EB2 visas immediately available at . . . filing of their adjustment of status applications to not having an EB2 visa immediately available to them for years because the 'current date' in the visa bulletin now predates their priority date [because, in September 2022, the dates retrogressed]"; (2) "USCIS and DOS are unlawfully withholding final agency actions on Plaintiffs['] applications" by not acting until a visa is immediately available; and (3) the last time the priority dates retrogressed in a similar manner "it took 8 years for [the dates] to [become] 'current' again." They then allege that the claimed unlawful withholding, and unreasonable delay, of agency action attributable to the defendants have caused them a variety of financial, emotional, and professional harms. These asserted injuries include loss of time and money completing paperwork to maintain their current status, loss of professional opportunities because they are "currently tied to their [petitioning] employers for work," loss of opportunities to see

family abroad, and ongoing anxiety due to uncertainty over their future immigration status.

We must take these well-pleaded facts as true and construe them in the light most favorable to the plaintiffs. See Legal Sea Foods, LLC v. Strathmore Ins. Co., 36 F.4th 29, 34 (1st Cir. 2022). We thus read the plaintiffs to be alleging specific harms arising from what they assert is the additional time they must wait for an adjustment of status due to (1) USCIS's decision to unreasonably delay or withhold action on their applications until an immigrant visa is "immediately available" to them and (2) DOS's decision to withhold the issuance of the requested visas themselves until they are "immediately available." In other words, at bottom, the plaintiffs assert that they are injured by the agencies' reliance on policies that violate § 1255, as they argue that so long as a visa is "available" -- and thus even if it is not "immediately available" -- § 1255 precludes USCIS from delaying adjudication, and DOS from withholding visa allocation, on the grounds that the plaintiffs are challenging.

To be sure, the defendants argue that their challenged policies are required by other statutory mandates, such as the statutorily established visa caps or the statutory requirement that visas be issued in priority-date order. But the plaintiffs dispute these assertions. As a result, the defendants' arguments regarding traceability and redressability reduce to arguments

- 14 -

about the meaning of applicable statutes and the limits those statutes impose on the defendants' behavior. Accordingly, those arguments are properly treated as arguments about the merits of the plaintiffs' claims, rather than questions of Article III standing, because, for purposes of the Article III standing inquiry, we must "accept as valid the merits of [the plaintiffs'] legal claims," Fed. Election Comm'n v. Cruz, 596 U.S. 289, 298 (2022), and "be careful not to decide the questions on the merits for or against the plaintiff[s]," City of Waukesha v. EPA, 320 F.3d 228, 235 (D.C. Cir. 2003).

Thus, we see no basis for concluding that the harms the plaintiffs allege are not fairly traceable to USCIS's policy of abstaining from acting upon the plaintiffs' applications and DOS's policy of abstaining from issuing them visas. Nor do we see why the relief sought -- an injunction barring USCIS and DOS from applying these policies to the plaintiffs -- would fail to redress those harms. See Antilles Cement Corp. v. Fortuno, 670 F.3d 310, 318 (1st Cir. 2012) ("To carry its burden of establishing redressability, [plaintiff] need only show that a favorable ruling

could potentially lessen its injury; it need not definitively demonstrate that a victory would completely remedy the harm.").

Finally, the District Court rejected the defendants' argument below that the plaintiffs had not suffered an injury in fact. We apprehend no error in that conclusion either.[4]

**III.**

The defendants separately contend that, even if the plaintiffs have Article III standing, there are statutory bars to the exercise of jurisdiction that require their claims to be dismissed. The defendants identify two such statutory bars.

The first is 8 U.S.C. § 1252(a)(2)(B)(i), which precludes review of "any judgment regarding the granting of relief under section . . . 1255." Relying on the Supreme Court's "expansive" reading of the statute's use of the term "any" and "regarding," Patel v. Garland, 596 U.S. 328, 338 (2022), the defendants assert that the challenged USCIS and DOS policies are "judgments" within the meaning of § 1252(a)(2)(B)(i), and thus shielded from review.

The second is 8 U.S.C. § 1252(a)(2)(B)(ii), which precludes review of "any other decision or action of the Attorney

---

[4] The cases on which the defendants rely, see Yu v. Chertoff, No. 07cv0296, 2008 WL 413269 (S.D. Cal. Feb. 12, 2008); Museboyina v. Jaddou, 4:22CV3169, 2023 WL 1438666 (D. Neb. Feb. 1, 2023), are either distinguishable or unpersuasive for the reasons given above.

General or the Secretary of Homeland Security the authority for which is specified . . . to be in the discretion of the Attorney General or the Secretary of Homeland Security, other than the granting of relief under" 8 U.S.C. § 1158(a). The defendants argue that their pre-adjudication policies are "decision[s]" that are "specified" to be in the DHS Secretary's discretion -- and thus unreviewable -- because § 1255(a) states that a noncitizen's status "may be adjusted by the [Secretary of Homeland Security], in his discretion and under such regulations as he may prescribe." The defendants then go on to contend that because § 701(a)(2) of the APA similarly precludes review of agency action "committed to agency discretion by law," dismissal of the plaintiffs' claims is required.

We need not resolve these disputes. Rather, we may assume there are no statutory bars to the exercise of jurisdiction and proceed directly to the merits, because, for the reasons we will next explain, we resolve the merits in the defendants' favor. See Doe v. Town of Lisbon, 78 F.4th 38, 44-45 (1st Cir. 2023) (holding that, when a case poses a question of statutory, rather than Article III, jurisdiction, "the question of jurisdiction need not be resolved if a decision on the merits will favor the party challenging the court's jurisdiction") (citation and internal quotation marks omitted).

**IV.**

The plaintiffs' claims chiefly implicate § 1255(a) and § 1255(b). As we will explain, we are not persuaded that either of these provisions prohibits the agency policies that are the target of the claims.

**A.**

We begin with the plaintiffs' claims against the Director of the USCIS. The claims allege that § 1255(a) bars USCIS from declining to adjudicate adjustment applications until an immigrant visa is "immediately available" to the applicant -- a practice that we refer to as the "abeyance policy." We cannot agree, as we are not persuaded by the plaintiffs' contention that § 1255(a) sets forth not only the eligibility criteria for adjustment of status, but also the asserted constraints on the process by which USCIS may, in its discretion, adjudicate applications for such adjustment.

Section 1255(a) provides that the status of a noncitizen "may be adjusted by the [Secretary of Homeland Security], in his discretion and under such regulations as he may prescribe, to that of a[] [noncitizen] lawfully admitted for permanent residence if (1) the [noncitizen] makes an application for such adjustment, (2) the [noncitizen] is eligible to receive an immigrant visa and is admissible to the United States for permanent residence, and (3) an immigrant visa is immediately available to him at the time his

application is filed." 8 U.S.C. § 1255(a). Thus, by its plain terms, § 1255(a) neither requires the Secretary of DHS to adjust the status of a noncitizen nor purports to address how the Secretary must adjudicate an application for adjustment that is filed. Rather, the text of § 1255(a) provides only that the Secretary may adjust a noncitizen's status as a matter of discretion under such regulations as the Secretary may prescribe if the noncitizen has applied for adjustment and meets certain criteria for applying.

To be sure, one of the criteria for applying for adjustment of status that § 1255(a) sets forth is that an immigrant visa must be "immediately available" at the time that the application for adjustment is filed. See id. But as to what must happen once that criterion for applying for adjustment has been met and an application for adjustment has been filed, the text of § 1255(a) is silent, except for providing that the Secretary of DHS may in his discretion adjust the applicant's status pursuant to regulations. Thus, we do not see how, based on § 1255(a)'s text, the provision may be understood to bar USCIS's abeyance policy, as that policy only concerns when, after an adjustment application has been filed, an application will be adjudicated. See Babaria v. Blinken, 87 F.4th 963, 977 (9th Cir. 2023) (holding that § 1255(a) provides specific guidance only on eligibility requirements and "vests the government with considerable leeway in

- 19 -

establishing the process [by which it adjudicates applications for adjustments of status]").

The plaintiffs acknowledge that, on its face, § 1255(a) establishes "eligibility criteria" for applying for adjustment, without also identifying any criteria for the process by which filed applications for adjustment are to be adjudicated by USCIS. But the plaintiffs contend that, despite what the text of § 1255(a) appears to indicate, the statutory and legislative history to that provision "makes abundantly clear that Congress rejected [the defendants'] . . . interpretation more than 45 years ago" when it amended the statute to tie visa availability to "the time [at which the noncitizen's] application is fil[ed]" rather than approved.

The plaintiffs point out that, in previous iterations of § 1255(a), the provision explicitly required that an immigrant visa be "immediately available" to an applicant "at the time his application [was] approved." See Immigration and Nationality Act, Pub. L. No. 82-414, § 245(a), 66 Stat. 163, 217 (1952); H. J. Res. 397, Pub. L. No. 86-648, § 10, 74 Stat. 504, 505 (1960). They further note that, in 1976, the precursor to § 1255(a) was amended to require only that a visa be "immediately available" at the time of filing. The plaintiffs argue that in so amending the statute Congress must be understood to have rejected, albeit implicitly, "the time of approval as the moment when a visa number must be current" in favor of the "date the application was filed."

- 20 -

To support this reading of § 1255(a), the plaintiffs direct our attention to a House Judiciary Committee report that proposed the 1976 amendment to § 1255. The report explains that the amendment's purpose was to "designate[] the date used in determining the availability of a visa number as the date the application is filed, rather than the approval date." H.R. Rep. No. 94-1553, at 15 (1976). The plaintiffs assert that this explanation shows that in enacting § 1255(a) Congress made an "intentional policy decision" to "reject[] the requirement to have a current visa number at approval." The plaintiffs then deduce that in enacting § 1255(a) Congress meant to preclude USCIS from relying on visa availability at the time of approval for any purpose.

The plaintiffs also attempt to buttress their reading of § 1255(a) by invoking the regulations that implement that provision. They note that those regulations tie eligibility for adjustment of status to immediate visa availability at the time of filing, rather than to immediate visa availability at the time of the approval of the adjustment of status. See 8 C.F.R. §§ 245.1(a), 245.1(g)(1), 245.2(a)(2)(i). The plaintiffs then contend that, by failing to require visa availability at the time of approval in the regulations implementing § 1255(a), "USCIS has interpreted congressional intent to require only a current visa at filing."

In sum, the plaintiffs argue that, even though the face of § 1255(a) speaks only to eligibility to apply for adjustment of status, "Congress spoke to the precise issue here." By changing the "eligibility criterion" under § 1255(a) and "designat[ing] the time of filing as the moment when a visa number must be current," the plaintiffs argue, Congress necessarily (though impliedly) precluded USCIS from holding applications until a visa would be immediately available at the time of approval.

We cannot agree. As the Ninth Circuit has detailed, under the pre-1976 statutory scheme, "[i]f circumstances changed while the application was pending -- for example, if the applicant's . . . job ended, and the immigrant visa petition was consequently denied or revoked -- the statute foreclosed adjustment of status." Babaria, 87 F.4th at 979 (emphasis added). It thus appears that the 1976 amendment, by tying statutory eligibility to the time of filing rather than the time of approval, was simply addressing this specific problem concerning the approval of an application for adjustment. See id.; see also Pei-Chi Tien v. Immigr. & Naturalization Serv., 638 F.2d 1324, 1329 n.13 (5th Cir. Unit A Mar. 1981) ("The requirement that an immigrant visa must be immediately available to the [noncitizen] at the time his application is 'approved' was changed to the time his application is 'filed,' perhaps indicating Congress' awareness of the delays involved prior to agency action on an application.").

- 22 -

As a result, we fail to see how the 1976 amendment supports the plaintiffs' position regarding the proper interpretation of § 1255(a) with respect to the timing of the mere adjudication of an application. Indeed, as we have emphasized, the 1976 amendment -- like § 1255(a) itself -- does not on its face speak to the timing of the adjudication of an application for adjustment.

This understanding of the 1976 amendment draws support from a committee report on a precursor to the 1976 bill. That report notes the view of the U.S. Department of Justice ("DOJ") that "[§ 1255(a)] [was] . . . amended to establish eligibility for an immigrant visa at the time the application is filed rather than at the time it is approved." H.R. Rep. No. 93-108, at 14 (1973) (emphasis added). And the report explains that the DOJ supported this change precisely because it would alleviate the harms suffered by applicants with respect to the approval of an application for adjustment of status. Id.

The plaintiffs' attempt to enlist the statute's regulations also fails to support their position. And that is so, even if we were to assume that regulations promulgated to implement the statutory provision could inform our understanding of the meaning of the provision itself.

The regulations that the plaintiffs reference pertain by their plain terms only to an applicant's eligibility to file an application for adjustment. See 8 C.F.R. §§ 245.1(a),

- 23 -

245.1(g)(1), 245.2(a)(2)(i). Thus, the regulations, too, do not speak to the process for adjudicating an application once filed by an eligible applicant.

In a final bid to support their reading of § 1255(a), the plaintiffs invoke the overall structure of the INA. Here, they point to other statutory provisions -- 8 U.S.C. §§ 1255(b) and 1153(d), (e), and (h)(1). They argue that each of these provisions is rendered "unworkable" by the USCIS abeyance policy that they challenge. As a result, they reason, Congress must have contemplated that no such policy could be implemented. It therefore follows, they contend, that § 1255(a) must be construed not to authorize the abeyance policy, even though the plain terms of § 1255(a) impose no such limitation on that policy's implementation. We disagree with this logic.

The plaintiffs' structural argument regarding § 1255(b) proceeds as follows. Under § 1255(b), once USCIS approves an adjustment application, DOS must "reduce by one the number of . . . preference visas authorized to be issued" under the statutory caps "for the fiscal year then current." 8 U.S.C. § 1255(b). If § 1255(a) permits USCIS to require that a visa be "immediately available" to an applicant for adjustment of status before the application itself may be adjudicated, then the plaintiffs assert there would be no risk that USCIS would run afoul of the statutory caps in approving such an application. Hence,

- 24 -

the plaintiffs argue, by referring in § 1255(b) to these statutory caps, Congress was only "assum[ing] that there will be a visa number available" at approval, regardless of whether one is "immediately available" at that time.

By its terms, however, § 1255(b) governs the processes that occur "[u]pon the approval of an application for adjustment made under" § 1255(a). Id. The provision thus speaks only to post-approval matters and not the process for adjudicating an application for adjustment.

To be sure, § 1255(b)'s reference to the statutory caps on visa issuance does show that Congress was cognizant of the limits that those caps place on visas being issued for approved applications for adjustment. We fail to see, however, how the reference to those caps shows that, in § 1255(a), Congress authorized USCIS to delay adjudication of such applications only to the extent that the caps themselves would require that delay.

The plaintiffs also harness their structural argument to 8 U.S.C. § 1153(d), which entitles certain family members of an applicant to immigration status. Once again, we are not persuaded.

Under § 1153(d), certain "spouse[s] or child[ren]" who "accompany[]" or later "follow[] to join" an applicant to the United States are "entitled to the same status, and the same order

of consideration" as the applicant.[5]  Id.  In such cases, the spouse or child is said to be a "derivative" of the "principal" applicant and beneficiary of the principal's immigrant visa petition.  7 USCIS, Policy Manual, pt. A, ch. 6, § C(6) (2024).

The plaintiffs argue that, in affording derivative family members the "same status" and "order of consideration" as the principal in § 1153(d), Congress also meant to entitle the derivative beneficiaries to the immediate issuance of an immigrant visa at the same time as the principal applicant, regardless of whether that visa is immediately available to the derivative beneficiary.  The plaintiffs then go on to argue that USCIS's abeyance policy conflicts with that mandate because USCIS could approve a principal's application and the bulletin could subsequently retrogress, thus delaying the derivative beneficiary's receipt of an immigrant visa.[6]  Based on this

---

[5] Section 1153(d) reads in full:

> A spouse or child as defined in subparagraph (A), (B), (C), (D), or (E) of section 1101(b)(1) of this title shall, if not otherwise entitled to an immigrant status and the immediate issuance of a visa under subsection (a), (b), or (c), be entitled to the same status, and the same order of consideration provided in the respective subsection, if accompanying or following to join, the spouse or parent.

[6] We note that at least one circuit has questioned whether retrogression could, in fact, solely impact the derivative beneficiary's application under USCIS's current policy.  See Babaria, 87 F.4th at 978.  But because the defendants do not appear

- 26 -

purported conflict, the plaintiffs assert that § 1153(d) supports their reading of § 1255(a) -- namely, that USCIS is precluded from considering immediate visa availability at the time of approval.

The text of § 1153(d), however, says nothing about when an application -- derivative or otherwise -- must be <u>adjudicated</u>. Nor do the plaintiffs develop an argument as to why we must construe § 1153(d) to implicitly place the limit on the timing of adjudication that they discern. In any event, even if we were to assume that § 1153(d) requires DOS to immediately issue a visa to a derivative beneficiary upon the principal's approval, it is not clear why that requirement would have any bearing on USCIS's decision to delay adjudication of the principal's application in the first place. Yet the plaintiffs fail to explain their apparent contention to the contrary.

The plaintiffs next point to § 1153(e), which requires that visas be issued in priority date order. But the requirement that DOS issue visas in order of priority dates says nothing about the time at which USCIS must adjudicate the application so long as the agency is proceeding in the proper chronological order. Thus, we do not see -- nor do the plaintiffs explain -- why we must conclude that § 1153(e) mandates the plaintiffs' interpretation of § 1255(a).

---

to contest this point, we assume for our purposes that such a scenario is possible.

The plaintiffs' next argument is that a provision of the Child Status Protection Act ("CSPA"), 8 U.S.C. § 1153(h)(1), demands a conclusion other than the one to which we arrive. This argument is similarly without merit.

In general, the CSPA "ensures that the time Government officials have spent processing immigration papers will not count against" a child who seeks derivative beneficiary status. Scialabba, 573 U.S. at 45 (plurality opinion). Under the INA, a "child" cannot claim derivative-beneficiary status unless he is under the age of twenty-one. 8 U.S.C. §§ 1153(d), 1101(b)(1). Thus, a child who is eligible for derivative status when his parent files an adjustment application may become ineligible due to the "simple passage of time." Scialabba, 573 U.S. at 51 (plurality opinion). To prevent children from "aging out" of eligibility due to administrative delays beyond their control, the CSPA creates a method for calculating the child's age, referred to as the "CSPA age." 7 USCIS, Policy Manual, pt. A, ch. 7, § A (2024).

In the case of employment-based visas, the "CSPA age" is calculated by subtracting the period from which the child's visa petition was pending from the child's age on "the date on which an immigrant visa number becomes available for" their parent. 8 U.S.C. § 1153(h)(1). In other words, the CSPA "freezes" the derivative beneficiary's age until a visa is "available."

- 28 -

The plaintiffs contend that § 1153(h)(1) confirms their reading of § 1255(a) because § 1153(h)(1) "assumes" that a visa need only be available to the child <u>at the time of the filing of the application for adjustment of status</u>. In support of this view, the plaintiffs direct our attention to the USCIS Policy Manual, which, in their view, shows that Congress intended for the "CSPA to freeze the child's age when the visa is current and adjustment of status application is filed." From that premise, they contend that it follows that Congress also assumed that a visa need not be immediately available at the time USCIS approves an application for adjustment of status.

Section 1153(h)(1), on its face, however, merely sets a noncitizen's "age" for the purposes of the child's eligibility for adjustment. It thus does not speak to the relevant issue here, which concerns when an application for the adjustment of status must be adjudicated. Indeed, the plaintiffs do not explain why the timing of the adjudication of such an application interferes in any way with the setting of the child's "age" under § 1153(h)(1).

In sum, USCIS's decision to hold in abeyance applications that lack an immediately available visa is not precluded by § 1255(a), considering the statute's text, history, and structure. Because this policy is within the agency's discretion, the plaintiffs have failed to state a claim under the

APA for unlawful withholding and unreasonable delay against the Director of the USCIS.

**B.**

The plaintiffs finally argue that DOS's independent requirement that a visa be "immediately available" at the time of the approval of an application for adjustment to permanent legal residence status violates § 1255(b). They assert that, even if this Court were to compel USCIS to adjudicate their applications and their applications were approved, DOS would refuse to issue them immigrant visas because those visas are not immediately available. Because § 1255(b) states that DOS "shall" allocate a visa number upon approval of an application for adjustment, the plaintiffs contend that DOS's refusal to issue an available immigrant visa to an approved applicant would be unlawful.

As we have explained, however, we conclude that USCIS's adjudication policy is not barred by § 1255 or any other statute to which the plaintiffs refer. We thus we see no basis for concluding that DOS's present application of its visa issuance policy is barred by § 1255(b).[7] Under USCIS's current policy, the

---

[7] As we noted in our discussion of Article III standing, the defendants contend that even if § 1255(a) required USCIS to adjudicate the plaintiffs' applications, § 1153(e) would nonetheless bar DOS from issuing the plaintiffs visas before they become immediately available to them. Because, for the reasons explained above, we conclude that § 1255(a) does not prohibit USCIS from instituting its abeyance policy, we need not address whether that is the case.

- 30 -

situation the plaintiffs contemplate cannot come to pass -- if an application is approved by USCIS, a visa <u>is</u> "immediately available." And under DOS's visa issuance policy, if a visa is "immediately available," DOS will issue a visa number. So, for every approved adjustment application, DOS will issue a visa number.[8] Thus, the plaintiffs have not stated a claim under the APA against the Secretary of the DOS.

**V.**

We are not without sympathy for the plaintiffs and the position in which they find themselves. After having lived, worked in, and contributed to this country for, in most cases, over a decade, Gupta, Gadkari, and the Patels have waited nearly four years for their Form I-485 applications to be adjudicated. Still, the sole ground for the plaintiffs' claims under the APA in this litigation is that § 1255 precludes USCIS and DOS from adjudicating their applications pursuant to the agencies' abeyance policy.[9]

---

[8] We do not address -- because we have no need to address -- the circumstance in which USCIS changes its abeyance policy, such that DOS's policy regarding visa issuance would pose an independent bar to visa issuance.

[9] At oral argument and in their reply brief, the plaintiffs aver that USCIS's and DOS's holding policy results in visa wastage and does not make sense. In other words, they appear to argue that the agencies' practices are arbitrary or capricious under the APA. Insofar as that contention is divorced from their argument that the agencies are statutorily prohibited from engaging in their current practice, that argument is waived. <u>Sparkle Hill, Inc.</u> v. <u>Interstate Mat Corp.</u>, 788 F.3d 25, 29 (1st Cir. 2015). We thus

That ground, for the foregoing reasons, is meritless.  The judgment

of the District Court is **affirmed**.

---

express no view as to whether such a challenge could succeed were
this court to have jurisdiction over it.